55 N.J. Super. 65 (1959)
150 A.2d 83
JEAN FERRIE AND ROBERT B. FERRIE, PLAINTIFFS-RESPONDENTS,
v.
MICHAEL D'ARC, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 1959.
Decided March 26, 1959.
*66 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Edward E. Kuebler argued the cause for defendant-appellant.
Mr. Joseph M. Thuring argued the cause for plaintiffs-respondents (Messrs. Salvest & Thuring, attorneys).
*67 The opinion of the court was delivered by FREUND, J.A.D.
Jean Ferrie, a 69-year-old woman, and her husband, Robert B. Ferrie, suing per quod, brought this negligence action against Michael D'Arc to recover for personal injuries sustained by her as a result of a fall from the platform of their small rear porch while in the act of throwing bones to her dog. At the time, the porch was in the process of reconstruction by the defendant-builder and his employees. The complaint alleged that the defendant's workmen had, on the day preceding the mishap, left the porch in an unsafe and dangerous condition by failing to erect handrails and that they had neglected to take reasonable precautions to prevent use of the platform and steps. At the close of plaintiffs' case and at the conclusion of the entire case, defendant moved to dismiss on the grounds of contributory negligence and assumption of risk. The judge of the County Court denied both motions, and the case was submitted to a jury, which returned verdicts of $4,000 for each of the plaintiffs. Defendant's motion for judgment notwithstanding the verdict was denied, R.R. 4:51-2(a), and this appeal followed.
The Ferries had lived in a one-family house at 197 Brighton Avenue, Kearny, for at least 11 years prior to the accident on April 18, 1956. For about eight of those years, they had a pet dog, "Lady." Their back porch was in a "very bad way," and on Saturday, April 14, 1956, plaintiffs engaged D'Arc to demolish the old stoop and to construct in its stead a new platform, steps, and railings, of the same size and type as the old ones, as well as a new front door and a letter box, all for the sum of $250. D'Arc said that the work would commence on the following Monday or Tuesday and that the work on the porch would be completed in one day.
Defendant's workmen began the job on that Tuesday. As the old steps and railings were demolished, the employees barricaded the back door of the house, which led from the kitchen to the porch. Except for the handrailings, the work on the rear porch was completed by 4:00 P.M., quitting *68 time. Before the workmen left the scene, they removed the back-door barricade. To permit the jury to appreciate the physical situation, two photographs of the porch as eventually completed were introduced into evidence. The trial judge pointed out the specific respects in which the photographs did not portray the condition of the porch as it was on the day of the accident.
The steps of the porch are in the direction of an alleyway separating plaintiffs' home from a dwelling next door. The right side of the porch, as seen from the kitchen door, faces the rear yard of plaintiffs' premises. One may enter the house from the rear by ascending the five porch steps, walking across the platform, which is approximately one square yard in area, and entering the kitchen door. This door is a combination aluminum screen and storm door. When it is closed, the handle is on the left (from the outside); it opens over the platform area and, when completely open, is flush against the rear wall and window of the home. The platform is about 38 inches from ground level.
On April 17 defendant's employees had left the steps and platform without either a horizontal railing above the platform or a diagonal railing along the steps, as there had been on the old porch. They had, however, erected two upright posts, one at the base of the steps and, as the jury could have found, one at that end of the platform nearest the house. To these posts and to one other to be erected on the top step would be nailed the wooden railings when the employees returned to complete the work. They left no "horse" or other barrier at the base of the steps. Defendant D'Arc testified that the barricades were removed at plaintiff's request so that her husband could use the rear steps when he returned from work.
The following day defendant's men "didn't show up at all." April 18 was a "wonderful," "rather balmy" day, and a friend came to have lunch with plaintiff. "Lady" had been let out the back door and was in the yard. Asked what happened after lunch, plaintiff testified:
*69 "A. Well, just as usual, we had lunch; and after we finished, I picked up the bones, I went out the door, out the outside door, and stepped onto the porch. The door closed behind. I turned around and I faced the yard. And I leaned over, and I always throw bones out to the dog any time I had them, and I fell into the yard because there was no railing there, there was no guard rail.
Q. Was Lady in the yard at the time when you threw the bones to her? A. Yes.
Q. Was she on the walk or on the grass? A. On the grass.
Q. Had you performed this act before this date? A. Many times."
Defendant's appeal from the judgment for plaintiffs is limited solely to the question of whether or not the trial judge properly concluded that the affirmative defenses of contributory negligence and assumption of risk were not established as a matter of law. No argument is made that the defendant's negligence was not the proximate cause of the plaintiff's injury, nor is it suggested that the defendant fully discharged whatever duty he owed plaintiff when she was made aware on April 17 that the work had not been completed. We are precluded from considering those issues.
The following portions of plaintiff's testimony bear particularly on the questions of contributory negligence and assumption of risk. Mrs. Ferrie testified that she had observed the progression of the work on April 17 and that she was aware the barricade had been removed, but she denied having instructed defendant's workmen to remove it. When Mr. Ferrie returned home that night, the absence of the railing was one of the things he discussed with his wife. Plaintiff said she did not use the porch from Tuesday evening until the accident on Wednesday, but she admitted having seen that there was no railing when she let the dog out before lunching with her friend. She testified on cross-examination as follows:
"Q. When you went out on the back porch, knowing the condition of the porch, you certainly thought it was safe to go out on the porch, didn't you. A. I can't answer that.

* * * * * * * *
Q. Well, now, in order to give the door clearance to close itself and you remaining on the platform, that brought you over pretty close to the edge, didn't it? A. Well, I throw the bones out so many times to the dog.
*70 Q. In other words, you had done this so many times before that it was a matter of sort of habit for you to do it on this particular day. Is that right? A. I always done it every day.

* * * * * * * *
Q. And the way you usually did it as a matter of habit was to come out and stand on the porch and lean against the railing? A. And the door closed after me, and I lean forward.
Q. And let the door close and then you would lean forward. And in that way there was sufficient clearance for the door to close. Is that right? A. Yes, that's right.
Q. So on this particular day you did as you usually did when there was a railing up. Is that correct? A. I did.
Q. I think, then, that you started to feed the dog. Is that correct? A. Yes. I threw the bones out to the dog.

* * * * * * * *
Q. It was when you were in the act of throwing one of the bones, with your body inclined forward, that you fell forward? A. I fell into the yard.
Q. And isn't it a fact that you had forgotten that there was no railing in place on this day? A. It wasn't just a matter of forgetting. I just didn't  I threw the bones and that was all.
Q. Isn't it a fact that you forgot for the time being that the railing was not there? A. I answered that question, didn't I.
Q. Will you answer it again. I say, isn't it a fact that when you were throwing the bone and inclining your body forward, you forgot that the railing was not there? A. That's right.
Q. You so testified before when you were asked the question:
`Question: And you also knew the railing was not there. Isn't that right? Answer: Yes, I knew the railing wasn't there. I forgot the railing wasn't there.'
Isn't that correct? A. That's right.
Q. And that's the way this accident happened? A. That's right."
There is nothing in the record to contradict plaintiff's testimony that she momentarily forgot that the handrail had not been installed. Defendant concedes as much, but argues that plaintiff was, in any event, guilty of contributory negligence and assumption of risk "beyond a peradventure of doubt." Defendant's brief, however, does not specify which act it is  that of entering upon the landing in the first instance or the act of leaning forward and throwing bones while thereon  that bars plaintiffs' claim. It cannot be the former, for the defendant's stated reason for removal of the barriers was to permit ingress and egress by use of the back steps and landing. The ordinary prudent person in *71 plaintiff's position might well have considered that the back porch was reasonably safe for entry thereon by her as well as by her husband.
The complained-of conduct must therefore be that of engaging in further activity while on the porch. If, however, plaintiff had actually forgotten that the railing was not there, it is difficult for us to say as a matter of law that she voluntarily assumed a known risk. While the term assumption of risk is used in varying senses, we believe, under the circumstances of this case, that it has reference merely to one form of contributory negligence. See Klinsky v. Hanson Van Winkle Munning Co., 38 N.J. Super. 439, 443 (App. Div. 1955); Coffey v. Middlesex-Spotswood, Inc., 52 N.J. Super. 39, 43 (App. Div. 1958). The question thus dissolves into an inquiry as to whether the forgetting of a known risk amounts to contributory negligence as a matter of law. In making that determination, we are of course mindful that the assessment of conduct is ordinarily a factual function and that the issue is one of law for the court only in the clearest cases of fault. See, e.g., Battaglia v. Norton, 16 N.J. 171, 179 (1954); Berger v. Shapiro, 52 N.J. Super. 94, 104 (App. Div.), certification granted 28 N.J. 306 (1958).
Memory is judged objectively by the standard of the reasonably prudent man. 2 Restatement, Torts, § 289, comment (f), p. 766; 2 Harper & James, Law of Torts (1956), § 16.5, p. 910. As a general rule, forgetfulness is no excuse, and the plaintiff's failure to avoid a known peril is in no wise excused by the fact that he "forgot." Ibid.; 38 Am. Jur., Negligence, § 187, p. 863; 65 C.J.S. Negligence § 120, p. 726; Prosser, Torts (2d ed. 1955), § 31, p. 129. See also 25 Am. Jur., Highways, § 468, p. 760. Yet all of the cited authorities recognize that to forget or to be inattentive is not negligence unless there is a failure to exercise ordinary care for one's own safety. Want of ordinary care, not previous knowledge of the danger, is the over-all test of contributory negligence. Coffey v. Middlesex-Spotswood, Inc., supra, 52 N.J. Super. at page 43.
*72 Thus it is that forgetfulness may be consistent with ordinary care where the cause of the plaintiff's lapse is such as would induce that state of mind in the reasonably prudent man, as in cases where the actor is startled, Williams v. Ballard Lumber Co., 41 Wash. 338, 83 P. 323 (Sup. Ct. 1906), where his attention is diverted, Crites v. City of New Richmond, 98 Wis. 55, 73 N.W. 322 (Sup. Ct. 1897), or where he is confronted with emergency conditions. We cannot accept the position, espoused by defendant, that recovery is limited to cases where the danger is latent or where the mental abstraction results from concentration on some external circumstance, and that the claim is barred where there is a mere mental absorption upon some other subject. But compare City of Birmingham v. Monette, 241 Ala. 109, 113, 1 So.2d 1, 4, 133 A.L.R. 1020, 1025 (Sup. Ct. 1941). Surely, the force of habit may absorb the mental faculties as compulsively as may some external distraction of which the actor is made aware by the exercise of sensory perception. Regard must always be had to the exigencies of the situation.
The circumstances here are that Mrs. Ferrie, an elderly lady, had habitually thrown scraps to her dog from the porch. She had been accustomed to lean on the handrail for the eight years she had the dog, and consequently acted, on the instant occasion, on the assumption that the rail was there. The day of the accident was the only day it was missing, having been removed only 24 hours before. While she did not say she had been distracted by the dog itself, her testimony indicates that she was moved by the force of habit.
In the present context, it has been said:
"* * * [T]he tendency has probably been towards letting all but the most flagrant cases go to the jury." 2 Harper & James, op. cit., supra, § 16.5, p. 911.
While the jury might well have come to a different conclusion on these facts, we are not prepared to hold that reasonably cautious men might not differ in appraising plaintiff's conduct.
*73 It should be noted that no attack as such has been made on plaintiff's credibility either at the trial level or on this appeal. Defendant did not move to set the verdict aside as contrary to the weight of the evidence, nor can there be found in the record any requests to charge specifically on the effect of plaintiff's "momentary forgetfulness," brought out on cross-examination. Implicit in the trial judge's denial of defendant's motion notwithstanding the verdict is a conclusion that plaintiff's testimony presented reasonably credible evidence.
The judgment is affirmed.